Joseph M. Alioto (SBN 42680)
Jamie L. Miller (SBN 271452)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200
Email:  jmalioto@aliotolaw.com
        jmiller@aliotolaw.com

[ADDITIONAL COUNSEL LISTED ON LAST PAGE]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| DANIEL GRACE, KATHERINE R. ARCELL, KEITH DEAN BRADT, JUDY BRAY, JOSE M. BRITO, JAN-MARIE BROWN, ROBERT D. CONWAY, JUDY CRANDALL, ROSEMARY D'AUGUSTA, BRENDA K. DAVIS, PAMELA FAUST, CAROLYN FJORD, DON FREELAND, DONNA FRY, GABRIEL GARAVANIAN, HARRY GARAVANIAN, YVONNE JOCELYN GARDNER, LEE M. GENTRY, VALARIE ANN JOLLY, GAIL S. KOSACH, JOHN LOVELL, MICHAEL C. MALANEY, LEN MARAZZO, LISA MCCARTHY, PATRICIA ANN MEEUWSEN, L. WEST OEHMIG, JR., CYNTHIA PROSTERMAN, DEBORAH M. PULFER, DANA L. ROBINSON, ROBERT A. ROSENTHAL, BILL RUBINSOHN, SONDRA K. RUSSELL, SYLVIA N. SPARKS, JUNE STANSBURY, CLYDE D. STENSRUD, WAYNE TALEFF, GARY TALEWSKY, ANNETTE M. TIPPETTS, DIANA LYNN ULTICAN, J. MICHAEL WALKER, PAMELA S. WARD, MICHAEL FARRAH, <br><br> Plaintiffs, <br>     v. <br><br> ALASKA AIR GROUP, INC. AND ALASKA AIRLINES, INC., <br><br> Defendants. | CASE NO.: <br><br> **COMPLAINT TO PROHIBIT THE ACQUISITION OF VIRGIN AMERICA BY ALASKA AIRLINES IN VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT, 15 U.S.C. § 18, AND SECTION 1 OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 1** |

INTRODUCTION

1.      This is a private antitrust action seeking an Order of the Court prohibiting the proposed elimination of Virgin America, Inc. (hereinafter referred to as "Virgin" or "Virgin America") by Alaska Air Group, Inc. and Alaska Airlines, Inc. (hereinafter both collectively referred to as "Alaska") as a violation of the antitrust laws.

2.      The "threatened loss or damage" to the Plaintiffs and to the public at-large by the potential elimination of Virgin America as a competitor, the most innovative, passenger friendly, premium low cost and unique airline in the industry, is substantial and foreboding.

3.      The proposed acquisition price is not trivial: $2.6 billion in cash and $1.4 billion in assumption of debt and leases.

4.      Virgin is a significant rival of Alaska, as well as a significant rival of the other domestic airlines, including the Network Carriers and the Low-Cost Carriers.

5.      The current trend toward concentration, the lessening of competition and tendency to create a monopoly in the airline industry is unmatched and unparalleled.

6.      The proposed acquisition is a violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18) in that the effect of the potential elimination of Virgin America may be "substantially to lessen competition, or tend to create a monopoly" in many markets in the passenger airline industry.[1]

7.      The proposed acquisition is prohibited by the binding authority of the Supreme Court of the United States in its decisions in *Brown Shoe Company v. United States*, 370 U.S. 294 (1962), *United States v. Philadelphia National Bank*, 374 U.S. 321 (1963), *United States v. Aluminum Company of America*, 377 U.S. 271 (1964), *United States v. Von's Grocery Company*, 384 U.S. 270 (1966), *United States v. Pabst Brewing Company*, 384 U.S. 546 (1966), and *United States v. Falstaff Brewing Corporation*, 410 U.S. 526 (1973).

8.      This private action is specifically authorized under Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26) which provides in pertinent part that "any person…shall be entitled to sue and have injunctive relief …against threatened loss or damage by a violation of the antitrust laws."

---

[1] Section 7 of the Clayton Antitrust Act provides in pertinent part as follows: "No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital … where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition *may* be substantially to lessen competition, or tend to create a monopoly." (Emphasis Added.)

*Complaint to Prohibit the Acquisition of Virgin America by Alaska Airlines in Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

9.      The remedy afforded to private plaintiffs includes divestiture, or prohibiting any potential unlawful acquisition.  As was unequivocally stated by the United States Supreme Court in *California v. American Stores Company*, 495 U.S. 271, 283 (1990), "[T]he literal text of Section 16 is plainly sufficient to authorize injunctive relief [in favor of a private Plaintiff], including an order of divestiture, that will prohibit that conduct from causing that harm." [2]

10.      The private action to vigorously challenge an acquisition is encouraged by the Congress and the Supreme Court of the United States.  In strong and unmistakable language, the Supreme Court has declared: "The Act's other provisions manifest a clear intent to encourage vigorous private litigation against anticompetitive mergers." *California v. American Stores Company*, 495 U.S. 271, 284 (1990)

11.      Plaintiffs bring this action under the authority of Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26) and allege that the proposed elimination of Virgin America by the Defendant Alaska Airlines constitutes a substantial threat of injury to the Plaintiffs because the acquisition may have the effect substantially to lessen competition and tend to create a monopoly in various markets in violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18).  In addition, the contract to eliminate Virgin America constitutes a "contract, combination in the form of a trust or otherwise, or conspiracy" as an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act[3] in that, among other things, it is a non-trivial transaction between significant rivals, neither of which is a failing company, that eliminates a substantial and growing competitor from the market.

12.      The proposed acquisition is in and substantially affects the interstate and foreign commerce of the United States in that flights, supplies, maintenance, parts and all the accoutrements and other necessities of the passenger airline industry are in the constant flow

---

[2] This private action is specifically authorized by Section 16 of the Clayton Antitrust Act on the grounds that the proposed acquisition poses a threatened loss or damage to the Plaintiffs by reason of the potential lessening of competition in the airline market in violation of the antitrust laws.

   Section 16 of the Clayton Act, 15 U.S.C. § 26, provides as follows: "Injunctive relief for private parties; exception; costs. Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue: Provided, That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit for injunctive relief against any common carrier subject to the jurisdiction of the Surface Transportation Board under subtitle IV of Title 49. In any action under this section in which the Plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such Plaintiff."

[3] 15 U.S.C. §1.

*Complaint to Prohibit the Acquisition of Virgin America by Alaska Airlines in Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

of the interstate and foreign commerce of the United States.  Because Defendants transact business in this judicial district, venue is proper pursuant to 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. § 1391.

13.     Plaintiffs seek an Order from the Court prohibiting the proposed acquisition by Alaska to eliminate Virgin America as a significant competitor.

14.     The passenger airline industry is a critical and vital modern necessity to the commercial, social and political well-being of the United States. Competition rather than combination is the rule of trade in the United States so that these Plaintiffs, and the public at large, may enjoy the benefits of competition, including, *inter alia*, the best possible services at the lowest possible prices. Vigorous enforcement of the antitrust laws by private persons is an essential part of the Congressional plan to ensure that competition rather than monopoly is, and remains, the rule of trade in the United States, including the airline industry.

15.     Virgin America, headquartered in Burlingame, California, and the only California based major airline, initiated air passenger service in 2007, the very year that the major airlines began their furious feeding frenzy of mega-mergers which has resulted in the reduction of the major airlines from eight competitors to four, effectively halving the principal competitive air transportation choices to the passenger public.

16.     The vital and critical importance of the enthusiastic and innovative competition of Virgin America and its presence in the airline markets can be measured against the near total lack of competition among the other major airlines and the abuses that have flowed and continue to flow as a result of their calculated scheme which threatens to inundate the entire industry like an enveloping tsunami.  Virgin is the most important bulwark to block this almost unstoppable trend toward complete concentration and monopoly in the airline industry.

17.     In 2008 Delta Airlines swallowed its significant actual and potential rival, Northwest Airlines, to form the largest airline in the United States at the time. Less than two years later, in 2010, United Airlines devoured its significant actual and potential rival, Continental Airlines, to become the then-largest airline in the United States.  In 2011, Southwest Airlines consumed its significant actual and potential Low Cost Carrier rival, AirTran, to become the carrier with the largest number of passengers in the United States and the largest Low Cost Carrier. And in 2013, American Airlines ingested its significant actual and potential competitor, USAir, becoming the largest airline in the United States.  Since these airline mega-mergers began in 2008, capacity has been substantially reduced and airfares

*Complaint to Prohibit the Acquisition of Virgin America by Alaska Airlines in Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

increased notwithstanding a strengthening economy and increased demand for air travel. According to a 2013 study, since 2007, scheduled domestic capacity in the 29 largest hubs has been reduced by 9%; in the 35 medium hubs, scheduled domestic capacity has been reduced by 26%; and in the 70 small hubs, scheduled domestic capacity has been reduced by 18%. The remaining flights have become more crowded.

18.    Since the mega-mergers began, the major airlines have increased and continue to increase their ancillary fees. In 2012, Delta, United, American and USAir charged more than $1 billion in reservation change fees. In 2012, U.S. domestic airlines collected more than $3.5 billion in baggage fees. In 2013, the four major carriers Delta, United, American and USAir all raised their charge for accommodating ticket changes from $150 to $200.

19.    If this proposed elimination of Virgin America is consummated, these fees may likely increase. Alaska admits that the consolidation in the industry has "fundamentally changed the industry structure" and that the airlines have found several "new revenue sources," earning a whopping $45 billion from 2010 to 2015.

20.    These four behemoths, Delta, United, Southwest and American, after having substantially eliminated all significant major competition, now control 84% of all passenger airline service in the United States. To maintain this dominance and control of the industry, these four giants stay in constant contact and instant price communication by means, among others, of a jointly owned and controlled "clearing house", APTCO, as well as CEO and executive contacts through secretive email, private telephone calls, and personal meetings at resorts, association meetings, private offices, restaurants, the secretive "Conquistadores del Cielo" annual shindig, and elsewhere, to stabilize fares, encourage "capacity discipline," shut down flights, and commit other anticompetitive practices and conduct. This breakdown in the free enterprise system in this important and critical American industry has resulted in the most unfriendly of skies for passenger airline service and pricing in the history of the industry since "deregulation" occurred in 1978.  Fares have substantially increased regardless of plunging costs and higher demand. Airplane capacity growth has been stifled by agreement. Thousands of employees (including executives, middle management, administrators, planners, pilots, stewardesses and stewards, maintenance workers, etc.) have been laid off because of the substantial elimination of meaningful competition. Absentee owners have prevailed who have little if any care for local communities and markets.  Available flights have been sharply reduced. New, illogical and unreasonable fees - many of which have been purposefully hidden

from the public - have been initiated in concert and by agreement among those competitors. Airports have been abandoned. Markets have been divided.  Additional seats have been added to aircraft to cram passengers into sardine-tin airplanes. Round-trip, "open jaw," and end-to-end passengers (mostly small, medium and even large business travelers flying to multiple city destinations) have been forced to pay higher fares than the simple addition of their flight segments for the same flight, same seat, and same time in order to subsidize the Big Four's below cost and predatory pricing on certain segments specifically aimed at fledging Ultra Low Cost Carriers ["ULCC"] such as Spirit, Allegiant and Frontier and Low Cost Carriers [LCC] such as Sun Country.

21.     By reason of this "closed" market, the Big Four are able to (1) engage in extraordinary anticompetitive and monopolistic practices and conduct without fear of competitive retribution by new entrants, (2) impose a cavalcade of abusive and discriminatory charges and fees against a helpless public, and (3) repudiate the laws of supply and demand. For example, when the price of oil dropped more than 50% from $103 to $47 per barrel - fuel being 40% of the cost to run an airline - the leader of the Big Four, Douglas Parker, CEO of American Airlines, announced that fares were going to continue at the higher rates just as though the price of oil had remained at $100 or more!  Or, after all of the Big Four had eliminated their significant actual and potential rivals, the CEOs continued to meet at their annual conclave, designated by them as the "Conquistadores del Cielo" (Conquerors of the Sky) - a closed group who adopted a covenant of secrecy about anything discussed at their dude ranch gatherings. At these outings, previously held in Arizona and now currently held at the A-Bar-A Ranch in Jackson, Wyoming, and subsequently at an IATA meeting, they agreed to observe "capacity discipline" in order to stabilize and raise fares and increase profits. And in a calculated insult to business travelers, American, Delta, and United further agreed through their wholly owned IATA "clearing house" to significantly raise the fares booked as multi-city flights even though the combined fares for individual segments on the same trip were much lower. In order to enforce this latest arrogance, American, Delta and United have threatened both travel agents and passengers: the travel agents were required to pay the difference between the multi-city fare and the individual fares, or fear losing their licenses; the passengers were threatened with the possibility of lost baggage and missed flights due to baggage delays or flight cancellations.

22.     In sum, the Big Four, acting in unison, have transformed the historical joy,

adventure and pleasure of air travel into drudgery, or, sometimes, even punishment and hidden thievery.  Recently, to counter the plethora of complaints levelled against the Big Four, American Airlines has launched a multi-million dollar "Great Flyer" advertising campaign implying that the plight of the passengers is really their own fault in failing to accept inconvenience, abuse, exorbitant expense and discomfort as the price for the privilege to fly.

23.     In 2007, when the trend toward concentration and the elimination of competition was beginning to heat-up in the airline industry, Virgin America, with much fanfare, initiated service from San Francisco International Airport. Inspired by the energy and enthusiasm of its founder, Sir Richard Branson, Virgin America offered a new promise of adventure, fun and excitement, as well as important destinations, convenient flight availabilities, new aircraft, expansion to major cities and lower cost air travel.  Branson founded Virgin "out of frustration . . . As more airlines consolidated and grew larger and more focused on the bottom line, flying in the US became an awful experience."  Innovation, imagination, initiative, comfort, lower fares and passenger-friendly service became the hallmarks of the new airline. Satellite Wi-Fi, individual entertainment screens at each seat, amenities, personal and premium service at lower cost, new destinations, expansion and plans for substantial increases in capacity and other offerings attracted both business and pleasure passengers. Virgin became the hands-down winner of the "Best Domestic Airline" award in respected travel magazines such as *Conde Nast Traveler's Readers' Choice Awards* and *Travel+Leisure's Annual World's Best Awards* over the past 8 years and the *Air Quality Rating Report* over the last 3 years.

24.     Since 2007, while the Big Four were shrinking their services, initiating hidden charges, cutting back their flights and inflating their fares, newborn Virgin America was expanding and burgeoning. By 2015, Virgin achieved annual revenues of $1.5 billion and pre-tax profits of $200 million – by the end of March, 2016, four days before the announcement by Alaska that it bought Virgin, Virgin posted net income of $345 million. More than 7 million annual passengers fly on Virgin America to 24 destinations. Virgin now flies to all ten of the top ten markets from San Francisco and to all ten of the top ten markets served out of Los Angeles.  Its fleet of aircraft climbed to 63 Airbus planes with 45 new Airbus aircraft currently on order.  Destinations and capacity expanded to 24 prime locations stretching from Hawaii to San Francisco and Los Angeles, and from the West Coast to Boston, New York and Washington DC, with flights to Mexico as well. Hubs were established in San Francisco, Los

Angeles and Dallas. In addition to these extraordinary successes and growth through increased capacity, Virgin is particularly well-positioned for the anticipated future demand for air travel for business and pleasure which is concededly "bullish" for premium low fare carriers and the rest of the airline industry. Virgin America is on the rise. It is on the cusp of "bullish" expectations.  It is not a "failing company," but a rising star.

25.    With such astonishing successes and an ever-increasing and loyal passenger base, Virgin was eyed as a very substantial and dangerous competitive threat to the status quo, and especially to its significant West Coast rival, Alaska Airlines, the defendant in this case.

26.    Alaska Airlines, headquartered out of Seattle, Washington, is the sixth largest airline in the United States. Alaska's principal operations emanate from the West Coast. Alaska has 52% of the market share of airline seats in the State of Alaska, 52% in the State of Washington, 43% in the State of Oregon, but only 7% in California. Alaska's most recent annual revenues were $5.6 billion with a pre-tax profit of $1.3 billion. Last year Alaska had 1000 daily departures to 112 destinations transporting 32 million passengers. From San Francisco airport Alaska serves only one of the top ten markets in the United States, and serves only one of the top ten markets served out of Los Angeles, namely, Seattle, WA. Alaska's fleet of aircraft is comprised mostly of Boeing planes, but it also flies Q 400s and regional jets. Alaska does not fly Airbus aircraft like Virgin.  As a result, one of the probable effects of the proposed elimination of Virgin will be the cancellation of all or some of the 45 or more Airbus aircraft currently on order by Virgin, an obvious irreparable anticompetitive harm which will have the rippling effect of increasing the cost of maintenance and parts, the layoff of Airbus technicians and maintenance personnel presently employed by Virgin, and will therefore create the probable need to increase fares and curtail the frequency of flights on current routes and expansion to new destinations.  The acquisition and consequent elimination of Virgin America may, and most probably will, result in higher fares, less service, fewer amenities and accommodations, the firing hundreds of Virgin employees, the eradication of consumer choice, along with other anticompetitive effects that may, and most probably will, flow from the elimination of Virgin from the market – a manifest irreparable harm that once lost may never be revived. However, and conversely, Alaska (without Virgin) has the wherewithal, the experience, the knowledge, and the ability to expand on its own, which would increase competition, lower prices, necessitate new jobs, increase consumer choice, invite investment, and otherwise allow the consumer to enjoy the benefits that competition

always provides.

27.    Alaska Airlines itself has designated four categories of the product market:

(1) Network Carriers (United, Delta, and American);

(2) Low Fare Premium Product Carriers [LFPC] (Alaska, Virgin, Hawaiian, and Jet Blue);

(3) Low Cost Carriers [LCC] (Southwest and Sun Country); and

(4) Ultra-Low Cost Carriers [ULCC] (Spirit, Allegiant, and Frontier).

Alaska Airlines has also designated five categories of geographic markets:

(1)    Nationwide;

(2)    West Coast;

(3)    California;

(4)    San Francisco (SFO International); and

(5)    Los Angeles (LAX International).

28.    Alaska has the wherewithal, the opportunity, the motive, and the clearly expressed intent to compete in each of the geographic markets it has designated, including the 22 current destinations in which it presently overlaps with Virgin. Indeed, it has the ability to compete against the Network Carriers and the Low Cost Carriers as well as the Low Fare Premium and the Ultra-Low Cost Carriers, not only in the geographic markets it has designated, but throughout the United States.

29.    The United States Supreme Court found it fundamental to free-enterprise economics that "Internal expansion is more likely to be the result of increased demand for the company's products and is more likely to provide increased investment in plants, more jobs and greater output. Conversely, expansion through merger is more likely to *reduce* available consumer choice while providing *no increase in industry capacity, jobs or output*. It was for these reasons, among others, Congress expressed its disapproval of successive acquisitions. Section 7 was enacted to prevent even small mergers that added to concentration in an industry." *Brown Shoe*, 370 U.S. at fn. 72 (Emphasis Added).

30.    The proposed elimination of Virgin America by Alaska Airlines poses a substantial threat to the Plaintiffs, and to the public at large, in that the proposed elimination will only serve, as the Supreme Court warned, to "reduce available consumer choice while providing no increase in industry capacity, jobs or output", and may lessen competition in each of those product and geographical markets designated by Alaska, and will potentially

- 9 -

*Complaint to Prohibit the Acquisition of Virgin America by Alaska Airlines in Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

cause loss to the Plaintiffs, and the public at large, in the form of higher fares, less availability and frequency of flights, less expansion to other destinations, curtailment of capacity, far less services and amenities, the elimination of consumer choice and other potential anticompetitive effects which deprive the Plaintiffs, and the public at large, of the salutary benefits of competition. And, as is customary in these anticompetitive acquisitions, the first casualties of the removal of competition will be the firing of employees who were only needed when competition existed.  These firings have already begun. Alaska has recently announced that it will fire approximately 225 of Virgin's executive personnel representing 8% of Virgin's workforce beginning as soon as October 11, 2016.  This announcement, made only a few days ago, substantially advances the acquisition timetable previously announced by Alaska and therefore requires immediate action by these Plaintiffs before Alaska takes additional steps to entrench its intention to eliminate Virgin as a competitor.

31.     The elimination of Virgin America is manifestly an irreparable harm since competition of the likes of Virgin America could be irretrievably lost. Virgin is a significant, unique and, in fact, the penultimate competitor of not only Alaska, but also directly against the major carriers and the other low cost carriers. Virgin is a vigorous competitor impacting and constraining the Network Carriers, the Low Cost Premium Carriers, the Low Cost Carriers and the Ultra-Low Cost Carriers nationally, on the West Coast, in California, San Francisco and in Los Angeles. Because Virgin offers premium services at lower fares, the National Carriers are constrained from taking their oligopoly to absolutely obscene limits (although they are close) since, if they should attempt to do so, the traveling public would switch to Virgin, which many have in fact already done with frequency. On the other hand, Low Cost Carriers, such as Southwest, need be wary that the reduction of services and flight availabilities may occasion their own regular customers to trade up to Virgin for its premium services at lower prices, especially since Southwest, after its acquisition of AirTran, has, on multiple occasions, joined the Network Carriers in price increases, flying crowded and crammed planes, imposing special charges and even leading the industry in fare increases.

32.     Virgin America, more than any other competitor, starkly illustrates to all airlines the competitive risk the airlines face when passengers have a competitive choice on either side of the spectrum to switch to Virgin if carriers push their anticompetitive practices to extremes that even otherwise loyal customers can no longer tolerate. All the while, Virgin continues to raise its competitive appeal to all.

33.     Nationally, the Low Fare Premium Product Carriers have 12% of the market. The National Carriers have 66%, the Low Cost Carriers have 19%, and the Ultra-Low Cost Carriers have just 3%.  Virgin, designated by Alaska as a Low Fare Premium Product Carrier, can and does compete against the National Carriers in flights from the major West Coast airports, SFO and LAX, to the major East Coast airports, NYC, NJ, Boston, Washington, DC., and others. Virgin is in direct competition with the National Carriers, the Low Fare Premium Carriers, the Low Cost Carriers and the Ultra-Low Cost Carriers and acts as a constraint on all of them.  Alaska has the ability to do the same, which Alaska does not deny, although Alaska claims it will be harder and take more time to build its trans-continental network from scratch, notwithstanding the fact that it is just this sort of competition that the Supreme Court has encouraged over acquisition.  Since Alaska has expressed its intention to compete nationally, its potential entry into the transcontinental market would serve as another constraint against the hegemony of the National Carriers, the Low Cost Carriers and even the Ultra-Low Cost carriers that fly from coast to coast.  Should the proposed elimination of Virgin go unchallenged, however, the nation would not only lose the competition of Virgin, but also the potential competition that Alaska would provide by building its own national presence. The proposed elimination of Virgin, therefore, would not only eliminate the stout and particular competition of Virgin, but would also discourage the prospective entry by Alaska into the national market and would ultimately lessen the competitive ideal espoused by the Congress and the Supreme Court of more consumer choice and availability through competition.

<u>THE PARTIES</u>

<u>Plaintiffs</u>

34.     The Plaintiffs named below are individual citizens of the cities and states listed. Each Plaintiff is an air passenger, and some are travel agents, all with the express interest and intent in insuring that the unique qualities of Virgin America are preserved as a competitive option for them and for their customers, now and in the future.  The potential elimination of Virgin will cause loss and harm to the Plaintiffs, and to the public at large, of the salutary benefits of the competition that Virgin brings, as well as the opportunity to fly and to continue to fly on Virgin.

Daniel Grace, San Francisco, CA
Katherine R. Arcell, New Orleans, LA;

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Keith Dean Bradt, Reno, NV;

Judy Bray, Colorado Springs, CO;

Jose' M. Brito, Reno, NV;

Jan-Marie Brown, Carson City, NV;

Robert D. Conway, Las Vegas, NV;

Judy Crandall, Reno, NV;

Rosemary D'Augusta, Millbrae, CA;

Brenda K. Davis, Forney, TX;

Pamela Faust, Loveland, Ohio;

Carolyn Fjord, Winters, CA;

Don Freeland, Thousand Palms, CA;

Donna Fry, Colorado Springs, CO;

Gabriel Garavanian, Tyngsboro, MA;

Harry Garavanian, Tyngsboro, MA;

Yvonne Jocelyn Gardner, Colorado Springs, CO;

Lee M. Gentry, West Chester, OH;

Valarie Ann Jolly, Mabank, TX;

Gail S. Kosach, Reno, NV;

John Lovell, Grand Rapids, MI;

Michael C. Malaney, Grandville, MI;

Len Marazzo, Reno, NV;

Lisa McCarthy, Naples, FL;

Patricia Ann Meeuwsen, Plainwell, MI;

L. West Oehmig, Jr., Lookout Mountain, TN;

Cynthia Prosterman, San Francisco, CA;

Deborah M. Pulfer, Sidney, OH;

Dana L. Robinson, Palm Beach Gardens, FL;

Robert A. Rosenthal, Colorado Springs, CO;

Bill Rubinsohn, Jenkintown, PA;

Sondra K. Russell, Waco, TX;

Sylvia N. Sparks, Carson City, NV;

June Stansbury, Reno, NV;

Clyde D. Stensrud, Kirkland, WA;

Wayne Taleff, Cincinnati, OH;

Gary Talewsky, Sharon, MA;

Annette M. Tippetts, Spanish Fork, Utah;

Diana Lynn Ultican, Kirkland, WA;

J. Michael Walker, Grass Valley, CA;

Pamela S. Ward, Garland, TX;

Michael Farrah, New York, NY.

*Complaint to Prohibit the Acquisition of Virgin America by Alaska Airlines in Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

1

<u>Defendants</u>

2      35.      Defendant Alaska Air Group, Inc. ("Alaska") is the parent company of

3    Defendant Alaska Airlines, Inc.  It is a corporation incorporated under the laws of the State of

4    Delaware with its principal place of business in Seattle, Washington.

5      36.      Defendant Alaska Airlines, Inc. is an Alaska corporation with its principal

6    place of business in Seattle, Washington.

7

<u>Virgin</u>

8      37.      Virgin America, Inc. is a corporation incorporated under the laws of the State

9    of Delaware with its headquarters and principal place of business in Burlingame, California,

10   adjacent to San Francisco International Airport.

11

RELEVANT MARKETS

12   <u>Relevant Product Markets</u>

13      38.      Domestic scheduled air passenger service enables consumers to travel quickly

14   between various cities in the United States.  Air travel offers passengers time-savings and

15   convenience over other forms of travel.  A flight from San Francisco to Los Angeles takes just

16   over an hour of flight time.  Driving between the two cities takes at least six hours.  A train

17   between the two cities takes more than twelve hours.  Due to the time-savings and the

18   convenience afforded by scheduled air passenger service, few passengers would substitute

19   other modes of transportation (car, bus, or train) for scheduled air passenger service in

20   response to a small but significant industry-wide fare increase.  Scheduled air passenger

21   service, therefore, constitutes a line of commerce and a relevant product market within the

     meaning of Section 7 of the Clayton Act.

22      39.      Additional markets may exist which themselves constitute product markets for

23   antitrust purposes.

24      40.      Scheduled air passenger service provided by domestic Low Fare Premium

25   Carriers is a product market, as admitted by Alaska.  Alaska has defined the Low Fare

26   Premium Product Carriers' [LFPC] market as being comprised of Alaska, Virgin, Hawaiian

27   Airlines and JetBlue.  Currently those four airlines in the low fare premium market account for

     12% of the total U.S. air passenger service revenue.  Currently, traditional Network Carriers,

28   such as United, Delta and American Airlines, a product market admitted by Alaska, command

<em>Complaint to Prohibit the Acquisition of Virgin America by Alaska Airlines in Violation of Section 7 of the<br/>Clayton Act and Section 1 of the Sherman Act</em>

a market accounting for 66% of the North American air passenger service revenue. Low Cost Carriers [LCC] Southwest and SunCountry Airlines constitute a product market admitted by Alaska that accounts for 19% of the total domestic scheduled air passenger market. Ultra-Low Cost Carriers [ULCC] Spirit, Allegiant and Frontier constitute a product market admitted by Alaska that account for 3% of the total domestic scheduled air passenger market.

<u>Relevant Geographic Markets</u>

41.     The entire United States is a geographic market admitted by Alaska for purposes of this action. Airfares are generally constrained by actual and potential competition from other airlines within a market.  Since any major existing airline has the capability to enter any market throughout the United States, the threat of potential competition from other existing airlines entering the market constrains airfares and services.  (As previously noted, it is conceded that no new airline can enter the market because of the impenetrable barriers to trade, including the cost of capital alone.)  As a result, the United States constitutes a relevant geographic market.  Along with the relevant national geographic market, well-defined additional areas may exist which in themselves constitute geographic markets for antitrust purposes.

42.     The West Coast, which includes the states of Alaska, Washington, Oregon and California, is a relevant geographic market, as admitted by Alaska, for the purposes of this action.  The relevant West Coast market is the market for scheduled air passenger service between and among airports in the West Coast and other destinations.  Defendant Alaska has proclaimed that the proposed transaction "[f]rom day one…will have the largest seat share on the West Coast," will create "the Premier Airline for People on the West Coast," and will become a "Powerful West Coast Network."  The proposed combination will have the largest and immediate share of 22% of the West Coast market.  Competitors, after the proposed elimination of Virgin, will have substantially lesser shares of the relevant West Coast market: Southwest – 21%; United –16%; Delta –12%; American –12%; Hawaiian – 7%; JetBlue –2%; and Spirit –1%.

43.     California is a relevant geographic market, as admitted by Alaska, for the purposes of this action. The relevant California market is the market for scheduled air passenger service to and from airports in California.  Virgin, with headquarters within this district, is the only airline headquartered in the State of California.  Alaska publicly stated that

the state of "California is our single largest opportunity" and that the elimination of Virgin creates "a strong West Coast airline for our customers." The threat of potential competition from other airlines entering a market constrains price increases.  Thus, scheduled air passenger service to and from airports in the state of California constitutes a relevant geographic market and "section of the country" within the meaning of Section 7 of the Clayton Act.

44.     Scheduled air passenger service to and from San Francisco International Airport (SFO) also constitutes a relevant geographic market, as admitted by Alaska, and a "section of the country" within the meaning of Section 7 of the Clayton Act.  Based upon seat share alone, the elimination of Virgin will make Alaska the "second largest carrier in SFO" with 16% of the SF market.  Once Virgin has been eliminated, Alaska's competitors will have the following shares of the relevant San Francisco geographic market: United—46%; Southwest—10%; American –12%; Delta –11%; and other –5%.   According to its president, Alaska's market position will move from a "distant #6 to a strong #2" in San Francisco.  Its "SFO Customer Utility" will grow from 6% to 58% in the top ten markets serviced from SFO, if Alaska is eliminated. Airlines do not view service at other airports as reasonable substitutes for the air transportation services and connections offered at San Francisco airport.  The San Francisco market is a geographic market within which passengers search for sources of supply.  Passengers within the San Francisco market do not generally search outside of that market to seek air transportation services.  As a result, scheduled air passenger service to and from SFO is a relevant geographic market, as admitted by Alaska, and "section of the country" within the meaning of Section 7 of the Clayton Act.

45.     Scheduled air passenger service to and from Los Angeles International Airport (LAX) also constitutes a relevant geographic market, as admitted by Alaska, and "section of the country" within the meaning of Section 7 of the Clayton Act.  Based on seat share, if Virgin is eliminated Alaska will have an 11% market share at Los Angeles International Airport (LAX).  The remaining competitors will have the following shares of the relevant LAX geographic market:  American—24%; Delta—20%; Southwest—18%; United –18%; and Other –9%.  If Virgin is eliminated, Alaska's utility at LAX servicing the top 10 markets from LAX will increase from 10% to 52%.   Airlines do not view service at other airports as reasonable substitutes for the air transportation services and connections offered at Los Angeles airport.  The Los Angeles market is a geographic market within which passengers search for sources of supply.  Passengers within the Los Angeles market do not generally

search outside of that market to seek air transportation services. As a result, scheduled air passenger service to and from LAX is a relevant geographic market, as admitted to Alaska, and "section of the country" within the meaning of Section 7 of the Clayton Act.

46.     Scheduled air passenger service between "city pairs" also constitutes a relevant geographic market and "section of the country" within the meaning of Section 7 of the Clayton Act.  A "city pair" is comprised of a flight's departure and arrival cities. For example, a flight departing from San Francisco and arriving in Seattle makes up the San Francisco-Seattle city pair. Passengers seek to depart from airports close to where they live and work, and arrive at airports close to their intended destinations. Most airline travel is related to business, family events and vacations.  Few passengers who wish to fly from one city to another would likely switch to flights between other cities in response to a significant fare increase, although, from the supply side, competing airlines would, if it were profitable to do so.

47.     Airlines customarily set fares on a city pair basis. For each city pair, the degree and nature of the competition from other airlines generally plays a large role in an airline's pricing decision.  Accordingly, each city pair is a relevant geographic market and "section of the country" under Section 7 of the Clayton Act.  The city-pair relevant markets serviced by Alaska and Virgin where there are overlapping, non-stop flights, include, *inter alia*, San Francisco (SFO) to Seattle (SEA), SFO to Portland (PD), SFO to Palm Springs (PSP), SFO to Puerto Vallarta (PVR), SFO to Los Cabos (SJD) and Los Angeles (LAX) to Seattle.   These city pairs constitute relevant geographic markets and "sections of the country" within the meaning of Section 7 of the Clayton Act.

<u>ANTICOMPETITTIVE EFFECTS OF THE TRANSACTION</u>

<u>The Agreement to Eliminate Virgin America as a Competitor in the Airline Industry</u>

48.     On April 4, 2016, Alaska announced an agreement in which Virgin would be eliminated as a competitor in the airline industry.  Alaska agreed to pay $2.6 billion in cash and $1.4 billion in assumption of debt and leases for a combined total of $4 billion to eliminate Virgin.

49.     Alaska previously announced that the elimination of Virgin would close by January 1, 2017 and that the combined airline would operate under the Alaska name. Defendants have recently rapidly advanced their time-table, having only recently announced

their intention to close in the fourth quarter of 2016 requiring these Plaintiffs to seek immediate relief.

50.     The proposed elimination will create the country's fifth largest airline with 6% of the national market.

51.     From day one, Alaska will have the largest seat share of any airline on the West Coast.

52.     If Virgin is eliminated Alaska will have a 16% market share at SFO, will become the "second largest carrier in SFO," and will have an 11% market share at LAX.

### Virgin Began as a Service-Oriented Innovator and "Price Disruptor"

53.     Virgin was founded in 2007 by English businessman and billionaire mogul Richard Branson "out of frustration" because "As more airlines consolidated and grew larger and more focused on the bottom line, flying in the US became an awful experience." Virgin has "always been intent on shaking up the status quo in the airline industry." Virgin is known as a "price disruptor" in the industry. Virgin provides a distinctive, stylish, boutique airline experience not offered by other domestic airlines today, with satellite Wi-Fi, recessed mood lighting, leather seats, and touch-screen in-flight services. It was the first airline to offer fleet-wide wireless internet access and became an instant favorite of diverse social groups.

54.     Alaska Executive Vice President and COO, Andrew Harrison, admitted that Virgin always had the edge over Alaska on service: "We also know, I'll just use some simple examples, but you know Virgin America has satellite [wifi]; we have air to ground. They have in-seat entertainment; we do not. They have a special [First Class] product that's certainly, for someone going long haul, more interesting than ours. It provides a lot more legroom and a lot more recline. Their brand is more edgy. Sometimes people think of us as conservative and stiff."

55.     Virgin's service-oriented offerings are targeted towards attracting the technology industry and small and medium business passengers as well as leisure travelers. Virgin has won numerous industry awards, including "Best Domestic Airline" in both *Travel+Leisure's Annual World's Best Awards* and *Conde Nast Traveler's Readers' Choice Awards* for the past eight years. Virgin ranked #1 for the past three years in the annual *Airline Quality Rating Report*, an annual study of U.S. domestic airline performance. Virgin is the only low-cost domestic airline with premium level service.

56.      Virgin went public with an IPO November 2014.  At the time, it intended to use the cash from that public offering to push for greater market share and new routes.  Other airlines consider Virgin a major potential competitor with the ability to grow its market share (1) because of its innovations and its distinctive brand, (2) because of its expansion into new routes and (3) because of its willingness to compete head to head on price and service.

57.      In addressing reports of the proposed elimination of Virgin America, its founder and investor Richard Branson expressed dissatisfaction with the proposed demise of his airline: "I would be lying if I didn't admit sadness that our wonderful airline is merging with another . . . There was sadly nothing I could do to stop it."  Branson abstained from voting for the elimination of Virgin "to make it clear that we would have rather stayed independent." [4]

### The Anticompetitive Effects of the Proposed Elimination of Virgin

58.      The proposed acquisition will eliminate Virgin as a substantial "price disruptor" in the relevant markets.  Post-acquisition air fares may increase and there may be less discounting on the Virgin routes taken by Alaska.  As noted by Jim Corridore, a Standard and Poor's Capital IQ analyst, commenting on the elimination of Virgin, "We think 'Virgin' was a price disruptor in the industry, so we think we will see less discounting on these routes." Eliminating Virgin as a competitor may, and probably will, decrease competition on regional flights up and down the western seaboard and on short-haul as well as transcontinental flights out of California.

59.      The population of California is 39.1 million, three times the population of the Pacific Northwest serviced by Alaska.  California is home to 185,700 daily domestic scheduled air service passengers, 2 ½ times that of the Pacific Northwest serviced by Alaska.

60.      The proposed acquisition will eliminate the only airline (Virgin) headquartered in California (Burlingame), will create absentee ownership by Alaska from Seattle – Alaska just announced that at least 225 management jobs in California will be eliminated - and will increase market concentration in two of the largest cities in the United States, Los Angeles and San Francisco, as well as nationally and on the West Coast and California.

---

[4] Branson's statement went on to explain: "Because I'm not American, the U.S. Department of Transportation stipulated I take some of my shares in Virgin America as non-voting shares, reducing my influence over any takeover.  So there was sadly nothing I could do to stop [the acquisition]."

61.     The potential elimination of Virgin will sound the death knell for Virgin's unique, customer-oriented brand of service.  Virgin has established an ardent following Nationwide, on the West Coast, in California, San Francisco, and Los Angeles for scheduled air passenger service based upon its unique brand of customer-first service and eclectic, off-beat offerings and amenities, all of which are skillfully implemented to please and delight, but all of which will nevertheless be lost when Virgin's desirable, customer-oriented service is replaced by Alaska's lean, cost-cutting operation.

62.     The proposed elimination of Virgin may result in the cancellation of Virgin's order for new aircraft and its concomitant increase in capacity and expansion. Alaska operates mostly Boeing aircraft.  Virgin, on the other hand, operates Airbus A319s and A320s and has a pending order for 45 new Airbus A320/A321 airplanes.  Virgin's current aircraft leases expire in 2020 but, according to Alaska, there is a "favorable cancellation provision" in Virgin's new A320/A321 orders.  As a result, if Virgin is eliminated, it is very probable that Alaska may decide not to operate a new type of aircraft with which it is unfamiliar, and will cancel Virgin's pending order for new Airbus planes.  Alaska's cancellation of the Airbus order and the lapse of the Virgin aircraft leases may lead to further capacity reductions in the air carrier market and may exacerbate the industry-wide so-called "capacity discipline" agreements among the major airlines that have plagued passengers since the airline mergers began in 2008 and which have served only to drive prices upward - and passenger service and satisfaction downward.

63.     If Virgin is eliminated, Alaska will operate in a highly concentrated market.  As a consequence, the potential for effective collusion among the remaining airlines may substantially increase while capacity and service may be cut and fares may rise.  The competition from Virgin, which had openly challenged the traditional Network Carriers' mantra of higher prices and lower capacity by offering lower prices as well as excellent service, will have been eliminated.

64.     If the competition of Virgin is eliminated, Alaska's potential competition against Virgin is also eliminated and the benefits of that competition are extinguished.

65.     Ultimately, Alaska's proposed elimination of Virgin may, and probably will, result in significant and irreparable harm and inconvenience to consumers, including the Plaintiffs, by propelling airfares higher, reducing the number of flights on particular routes,

and eliminating the most innovative, imaginative, comfortable and low priced premium airline in the industry.

### The Relevant Markets Are Highly Concentrated and the Proposed Elimination of Virgin America Will Result in Presumptively Unlawful Market Concentrations

66.     The decrease in the number of major airlines over the past several years reflects a persistent and deliberate pattern of concentration and reduction of competition in the U.S. airline industry, a trend which the Supreme Court has said must be arrested in its incipiency.

67.     The elimination of Virgin by Alaska will result in the fifth largest airline in the United States with over 6% of the scheduled air passenger service market in an already highly concentrated market where the biggest four airlines' market share is already 84% by revenue, according to Alaska.  Such a 90% concentration of market share in five firms is unacceptably high, ineluctably leading to collusion.

68.     Market concentration is an indication of the level of competition in a market. The more concentrated a market, and the more a transaction may increase concentration in a particular market, the more likely it is that a transaction may result in a meaningful lessening in competition.

69.     Concentration in relevant markets is sometimes measured by the Herfindahl-Hirschman Index ("HHI").  Markets in which the HHI exceeds 2,500 points are considered highly concentrated.  Post-acquisition increases in HHI of more than 200 points are presumed to be anticompetitive. (Horizontal Merger Guidelines, § 5.3.)

70.     In at least four of the six city-pair markets alone in which Alaska and Virgin currently compete head-to-head the post-acquisition HHI would exceed 2,500 points and the acquisition would increase the HHI by more than 200 points making them presumptively illegal.

71.     Defendants have overlapping non-stop flights on six routes:  San Francisco (SFO) to Seattle (SEA); SFO to Portland (PD); SFO to Palm Springs (PSP); SFO to Puerto Vallarta (PVR); SFO to Los Cabos (SJD); and Los Angeles (LAX) to Seattle.  The elimination of Virgin America on these routes may result in fare increases, fewer flights and availability, and a clear elimination of consumer choice, as well as substantial increases in concentration.

72.     If Virgin is eliminated, market concentration on at least four routes will exceed the thresholds specified in the U.S. Horizontal Merger Guidelines of the U.S. Department of

- 20 -

*Complaint to Prohibit the Acquisition of Virgin America by Alaska Airlines in Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

Justice, will be presumptively illegal, and may, and most probably will, lead to adverse competitive effects, including increases in fares, reductions in service and loss of choice.

73.     Before the elimination of Virgin, the HHI of the San Francisco-Palm Springs city-pair is 3,073, a market considered already highly concentrated under the Department of Justice's Horizontal Merger Guidelines.  After Virgin is eliminated, the HHI will be 4,305, an increase of 1,232, which is "presumed likely to enhance market power."

74.     Before the elimination of Virgin, the HHI of the Seattle-San Francisco city-pair is 2,850, a market considered already "highly concentrated" under the Department of Justice's Horizontal Merger Guidelines.  After Virgin is eliminated, the HHI will be 3,705, an increase of 855, which is "presumed likely to enhanced market power."

75.     Before the elimination of Virgin, the HHI of the Seattle-Los Angeles city-pair is 3,799, a market considered already highly concentrated under the Department of Justice's Horizontal Merger Guidelines.  After Virgin is eliminated, the HHI will be 4,692, an increase of 893, which is "presumed likely to enhance market power."

76.     Before the elimination of Virgin, the HHI of the San Francisco-Portland city-pair is 2,727, a market considered already highly concentrated under the Department of Justice's Horizontal Merger Guidelines.  After Virgin is eliminated, the HHI will be 2,958, an increase of 231, which is "presumed likely to enhance market power."

| CITY PAIR | PRE-ELIMINATION HHI | POST- ELIMINATION INCREASE IN HHI | PRESUMPTIVELY ILLEGAL |
|---|---|---|---|
| SFO-Palm Springs | 3,073 | 1,232 | YES |
| SFO-Seattle | 2,850 | 855 | YES |
| Seattle-LAX | 3,799 | 893 | YES |
| SFO-Portland | 2,727 | 231 | YES |

77.     As noted, Alaska and Virgin currently have 22 overlapping destinations. Virgin is known as a "price disruptor" in the industry. If Virgin is eliminated, this acquisition may likely eliminate the actual and potential competition between Alaska and Virgin on routes to these destinations as well, significantly harming consumers in the process.  In addition, the loss of Virgin's competition in these markets may increase the likelihood that the remaining airlines will coordinate with other airlines to raise prices, reduce output and diminish the quality of their services, thereby lessening competition in these 22 overlapping markets.

78. In addition, Alaska's elimination of Virgin will be virtually certain to cause substantial irreparable injury to Plaintiffs and to all consumers for domestic scheduled air passenger transportation services in the relevant geographic and product markets in that, among other reasons, Virgin, and the consumer choices that go with it, will be gone, and once gone, the harm would be irreparable.

79. Plaintiffs are threatened with the loss of (1) the distinctive services and in-flight experience offered by Virgin; (2) a reduction in customer choice; (3) a reduction in capacity and the curtailment of flights thereby creating higher prices and severe inconvenience to consumers; (4) the loss of the only airline currently headquartered in California with the substitution of an absentee owner and operator; and (5) ultimately the loss of a vibrant, vigorous and innovative competitor. The elimination of Virgin will further reduce the number of airlines servicing Hawaii, the Western states and the East coast, and in so doing, substantially threatens to harm U.S. passengers through increases in the price of tickets, checked bags and flight change fees, translating to billions of dollars of harm to consumers annually, and further threatens to deprive passengers of the unique comfort, style, affordability, service and flying experience offered by Virgin America.

80. If Virgin America is eliminated, Plaintiffs will sustain irreparable harm for which damages will be inadequate to compensate Plaintiffs in that the competition from a "price-disruptor" will be extirpated and customer choice for travel options eradicated. The imagination and initiative of Virgin will be snuffed-out; modern jets and expansion plans will be jettisoned; customer convenience and satisfaction will be disregarded. Virgin America's air service once lost cannot be restored.

81. In addition, Alaska's acquisition (1) threatens to derail Alaska's proposed expansion into the San Jose market, with a concomitant loss of jobs there; (2) threatens to derail Virgin's planned acquisition of additional aircraft, thereby lessening the passenger capacity of air traffic in the relevant markets; and (3) threatens to substantially reduce the work force of the two airlines through employee layoffs due to the elimination of competition.

82. Moreover, since existing trade barriers will effectively preclude the introduction of a new airline, there will likely be no new startup entrants into the airline market because new entrants would face significant barriers to success, including difficulty in obtaining access to gate facilities; difficulty in competing with the effects of corporate discount programs offered by dominant incumbents; difficulty due to customer loyalty to

existing frequent flyer programs; difficulty of promoting an unknown brand; and the risk of aggressive responses to new entry by the dominant incumbent carriers. The former CEO of United testified that only an established airline could now enter the major markets in the United States.  Indeed, American's CEO Doug Parker further admitted that no new airline could enter the market because it would not even be able to cover its cost of capital.

83.     Since 2007, only Virgin has successfully entered the scheduled air passenger transportation markets as a major airline.  The proposed elimination now seeks to swallow whole the only new competitor to enter the market in ten years.  Virgin CEO David Cush, in addressing the likelihood or possibility of a new competitor entering the market, admitted that "[t]he competitive environment probably would not allow it.  So, I think it's going to be a long time before you see a national start up in the airline business again."

84.     Since the prospect of a new start-up entry is unlikely, the entry of new competitors in the marketplace cannot serve as a basis to mitigate the anticompetitive effects that may result from Alaska's proposed acquisition.

85.     Alaska as an existing airline, however, has the wherewithal, experience, financial ability, intent, and expertise to enter into the very markets and areas it seeks to gain by its elimination of Virgin. Such an entry by Alaska on new routes and into new markets would increase competition, create new jobs, lower fares, increase capacity, increase availability, and enhance consumer choice. The elimination of Virgin would do exactly the opposite.

86.     Neither Alaska nor Virgin is a failing company.  Virgin today is competing vigorously and earning profits - $200 million according to Alaska.  It is not a failing airline. According to Virgin, since its successful IPO in 2014, Virgin has achieved a number of critical milestones with an annual net income of over $201 million in 2015 – an increase of 139% over fiscal 2014.  Virgin posted net income of $345 million as of March, 2016.  Virgin increased the number of its passengers from 6,386,000 to 7,079,000, a 10.8% increase.  Virgin also outperformed the industry in unit revenue growth and initiated a plan to grow the airline even further with new aircraft deliveries.

87.     Alaska also is profitable, thriving and growing. As of March, 2016, Alaska posted net income of $868 million.  Alaska increased the number of its passengers from 19,722,000 to 21,680,000, a 9.9% increase. With regard to Alaska's current financial

*Complaint to Prohibit the Acquisition of Virgin America by Alaska Airlines in Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

condition, Alaska CEO Tilden has admitted that "We are operating from a position of strength."

88.     Both Alaska and Virgin are strong, vigorous and viable actual and potential competitors in all the airline markets and each is and has been ready, willing and able to compete against the other airlines for market share, including against the Big Four. As a result, there simply is no competitive need to eliminate Virgin as a competitor.  To the contrary, the continued vigorous competition of Virgin is one of the few, if not the principal, remaining competitive forces in the market. Its continued existence in the market is needed to preserve and protect the minimal amount of competition that exists in the airline industry today.  Indeed, if there is to be any restoration of competition in the airline industry, Virgin is the airline that will cause it.

89.     Accordingly, Plaintiffs bring this action for both preliminary and permanent injunctive relief against Defendants' proposed elimination of Virgin and seek an order prohibiting Defendants from acquiring Virgin.

<u>VIOLATIONS ALLEGED</u>

<u>Clayton Act, Section 7, 15 U.S.C. § 18</u>

90.     The effect of the proposed acquisition may be substantially to lessen competition, or tend to create a monopoly, in interstate trade and commerce in the relevant markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

91.     Unless enjoined, the proposed acquisition may, and most probably would, have the following potential effects in the relevant markets, among others:

> (a) actual and potential competition between Alaska and Virgin may be
> eliminated;
> (b) competition in general among other airlines may be lessened
> substantially;
> (c) ticket prices and ancillary fees may be higher than they otherwise would be;
> (d) industry capacity may be lower than it otherwise would be; and
> (e) service may be lessened.

92.     By reason of this violation, the Plaintiffs are threatened with loss or damage in the form of potentially higher ticket prices and diminished service, the potential elimination of a favored airline, as well as additional irreparable harm for which damages will be inadequate

to compensate Plaintiffs.   Plaintiffs are entitled to bring suit under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, to obtain preliminary and permanent injunctive relief against this proposed acquisition, and to recover their costs of suit, including a reasonable attorney's fee.

Sherman Act, Section 1, 15 U.S.C. § 1

93.    The contract to acquire Virgin America is a contract in unreasonable restraint of trade and unenforceable because it eliminates a significant rival airline in a non-trivial transaction. The elimination of competition by agreement between significant rivals, neither one of which is a "failing company" and both of which are vibrant, efficient, experienced, and financially able airlines affecting interstate commerce is unlawful, against the public policy of the United States, and *ipso facto* null and void. As a contract in unreasonable restraint of trade it therefore is a violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

94.    Unless enjoined, the elimination of Virgin may have the following potential effects in the relevant markets, among others:

(a) actual and potential competition between Alaska and Virgin may be eliminated;

(b) actual and potential competition between Virgin and other airlines may be eliminated;

(c) competition in general among other airlines may be substantially lessened;

(d) Virgin may be foreclosed from a significant market;

(e) ticket prices and ancillary fees may be higher than they otherwise would;

(f) industry capacity may be lower than it otherwise would; and

(g) services may be lessened.

95.    By reason of this violation, the Plaintiffs are threatened with loss or damage in the form of higher ticket prices and diminished service, as well as irreparable harm for which damages will be inadequate to compensate Plaintiffs.   Plaintiffs are entitled to bring suit under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, to obtain preliminary and permanent injunctive relief against this acquisition, and to recover their costs of suit, including a reasonable attorney's fee.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief from this Honorable Court:

*Complaint to Prohibit the Acquisition of Virgin America by Alaska Airlines in Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

A.      Declaring, finding, adjudging and decreeing that the agreement of Alaska to acquire Virgin violates Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18.

B.      Declaring, finding, adjudging and decreeing that the contract between Alaska and Virgin to eliminate Virgin as a competitor violates Section 1 of the Sherman Act, 15 U.S.C. § 1.

C.      Preliminarily enjoining Alaska from consummating the acquisition of Virgin, or, if necessary, ordering divestiture, during the pendency of this action.

D.      Permanently enjoining Defendants and Virgin from consummating the acquisition or requiring divestiture.

E.       Declaring the contract between the Defendants and Virgin America to be null and void and against the public policy of the United States which declares that competition rather than combination is the rule of trade in the United States;

F.      Awarding to Plaintiffs their costs of suit, including a reasonable attorney's fee, as provided by Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

G.      Granting to Plaintiffs such other and further relief to which they may be entitled and which the Court finds to be just and proper.

Dated: September 6, 2016

By:___/s /Joseph M. Alioto_____
                    Joseph M. Alioto (SBN 42680)
                    Jamie L. Miller (SBN 271452)
                    ALIOTO LAW FIRM
                    One Sansome Street, 35th Floor
                    San Francisco, CA  94104
                    Telephone: (415) 434-8900
                    Facsimile: (415) 434-9200
                    E-mail:  jmalioto@aliotolaw.com
                              jmiller@aliotolaw.com

*Complaint to Prohibit the Acquisition of Virgin America by Alaska Airlines in Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Lawrence G. Papale (SBN 67068)
LAW OFFICES OF LAWRENCE G. PAPALE
The Cornerstone Building
1308 Main Street, Suite 117
St. Helena, CA 94574
Telephone: (707) 963-1704
Facsimile: (707) 963-0706
Email: lgpapale@papalelaw.com

Christopher A. Nedeau (SBN 81297)
Attorney at Law
NEDEAU LAW FIRM
154 Baker Street
San Francisco, CA 94117
Telephone:  415-516-4010
Email:  cnedeau@nedeaulaw.net

COUNSEL FOR THE PLAINTIFFS

*Complaint to Prohibit the Acquisition of Virgin America by Alaska Airlines in Violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act*

EXHIBIT A



# The Premier Airline for People on the West Coast

EXHIBIT A, PAGE 001

# Safe Harbor

This presentation contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements are based on, and include statements about, the Company's estimates, expectations, beliefs, intentions, and strategies for the future, and are not guarantees of future performance. Forward-looking statements involve risks, uncertainties, assumptions, and other factors that are difficult to predict and that could cause actual results to vary materially from those expressed in or indicated by them. Please refer to the risk factors described in Company's filings with the Securities and Exchange Commission, including the detailed factors discussed under "Risk Factors" in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2015.

**EXHIBIT A, PAGE 002**

# Important information for investors and stockholders

This communication may be deemed to be solicitation material in respect of the merger of Virgin America with a wholly owned subsidiary of Alaska Air Group.  Virgin America intends to file relevant materials with the Securities and Exchange Commission (the "SEC"), including a proxy statement in preliminary and definitive form, in connection with the solicitation of proxies for the merger. The definitive proxy statement will contain important information about the proposed merger and related matters. BEFORE MAKING A VOTING DECISION, STOCKHOLDERS OF VIRGIN AMERICA ARE URGED TO READ THE DEFINITIVE PROXY STATEMENT AND OTHER RELEVANT MATERIALS CAREFULLY AND IN THEIR ENTIRETY WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT VIRGIN AMERICA AND THE MERGER. Stockholders will be able to obtain copies of the proxy statement and other relevant materials (when they become available) and any other documents filed by Virgin America with the SEC for no charge at the SEC's website at www.sec.gov. In addition, security holders will be able to obtain free copies of the proxy statement from Virgin America by contacting Virgin America's Investor Relations Department by telephone at (650) 762-7000, by mail to Virgin America Inc., Attention: Investor Relations Department, 555 Airport Boulevard, Burlingame, California 94010, or by going to Virgin America's Investor Relations page on its corporate website at http://ir.virginamerica.com.

**EXHIBIT A, PAGE 003**

# Important information for investors and stockholders

Alaska Air Group, Virgin America and certain of their respective directors, executive officers and other employees may be deemed to be participants in the solicitation of proxies from Virgin America's stockholders in respect of the merger. Information concerning the ownership of Virgin America securities by Virgin America's directors and executive officers is included in their SEC filings on Forms 3, 4, and 5, and additional information about Virgin America's directors and executive officers is also available in Virgin America's proxy statement for its 2016 annual meeting of stockholders filed with the SEC on March 25, 2016, and is supplemented by other public filings made, and to be made, with the SEC by Virgin America. Information concerning Alaska Air Group's directors and executive officers is available in Alaska Air Group's proxy statement for its 2016 annual meeting of stockholders filed with the SEC on April 1, 2016. Other information regarding persons who may be deemed participants in the proxy solicitation, including their respective interests by security holdings or otherwise, will be set forth in the definitive proxy statement that Virgin America intends to file with the SEC. These documents can be obtained free of charge from the sources indicated above.

# Alaska + Virgin by the Numbers



| |  Alaska |  Virgin america | = |
|---|---|---|---|
| **Annual Revenues** | $5.6 Billion | $1.5 Billion | $7.1 Billion |
| **Annual Passengers** | 32 Million | 7 Million | 39 Million |
| **Aircraft** | 152 Boeing 52 Q400 15 regional jets | 63 Airbus | 282 |
| **Daily Departures** | 1,000 | 200 | 1,200 |
| **Destinations** | 112 | 24 | 114* |
| **Pre-Tax Profit** | $1.3 Billion | $200 Million | $1.5 Billion |

**EXHIBIT A, PAGE 005**

*AS and VX have 22 current destinations that overlap.

# The Premier Airline for People on the West Coast

## Deal Facts

Transaction:  $2.6B all cash deal

Airline Name:  Alaska  Airlines

Total Employees: 18,300

Corporate Office: Seattle with continued presence in San Francisco

## Management Structure

CEO:  Brad Tilden

COO: Ben Minicucci

CFO: Brandon Pedersen

CCO:  Andrew Harrison



EXHIBIT A, PAGE 006

# Our shared passion for service is widely recognized





**Widely recognized
as best in class**





**#1 Traditional Carrier
8 straight years**

**"Highest in Customer Satisfaction
Among Traditional Carriers in North
America, Eight Years in a Row"**



**EXHIBIT A, PAGE 007**

Alaska brand stays. We will explore options for the Virgin brand in the future.





EXHIBIT A, PAGE 008

# We are bullish on the industry.



1977 — 33 years ➤ 2009   -$52B

2010 — 6 years ➤ 2015   $45B

## Changed Industry Dynamics

- Fundamentally changed industry structure

- Returns focused leadership teams

- Constrained airport real estate

- Growth in leisure travel

- New revenue sources

**EXHIBIT A, PAGE 009**

9

# We're confident in our own business and our ability to create value for our constituencies.

## Safe



## Great Operation

### THE WALL STREET JOURNAL.

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| 1 | Alaska | Alaska | Alaska |
| 2 | Virgin Amer. | Virgin Amer. | Delta |
| 3 | Delta | Delta | Virgin Amer. |
| 4 | Southwest | JetBlue | Southwest |
| 5 | JetBlue | Southwest | JetBlue |

## Award Winning Service



"Highest in Customer Satisfaction Among Traditional Carriers in North America, Eight Years in a Row"

## Employee Engagement



## Strong Balance Sheet

### AIRLINE CREDIT RATING

| | S&P | Fitch |
|---|---|---|
| BBB+ | | Southwest |
| BBB | Southwest | |
| BBB- | Alaska | Alaska |
| BB+ | | Alaska+ |
| BB | allegiant | |
| BB- | jetBlue | |
| B+ | | jetBlue |

## High Margins



| S&... | Ind... | Leg... | LC... | Ala... |
|---|---|---|---|---|
| 13% | 13% | 14% | 19% | 24% |

**EXHIBIT A, PAGE 010**

# Consolidation has led to dominance of just four airlines.

## Airline Domestic Market Share (Revenue)

| 1980 | 1990 | 2000 | 2010 | 2015 |
|------|------|------|------|------|
| *(logos of various airlines including Ozark, Piedmont, PSA, USAir, Northwest, TWA, Alaska Airlines)* | *(logos: Hawaiian, Alaska, America West Airlines, Eastern, Fly Southwest Airlines, Continental, TWA, Northwest Airlines)* | *(logos: AirTran, Hawaiian, spirit, Frontier, Alaska Airlines, America West Airlines, TWA, Continental Airlines, US Airways, Southwest.com)* | *(logos: America West, Hawaiian, allegiant, spirit, Frontier, AirTran, Alaska Airlines, jetBlue, US Airways, Continental Airlines)* | *(logos: America, Hawaiian, allegiant, spirit, Frontier, jetBlue, Alaska)* |
| DELTA | USAir | nwa | UNITED | Southwest |
| EASTERN | DELTA | UNITED | Southwest.com | UNITED |
| American Airlines | United Airlines | American Airlines | American Airlines | DELTA |
| United Airlines | American Airlines | Delta | DELTA | American Airlines |

| | 1980 | 1990 | 2000 | 2010 | 2015 |
|---|------|------|------|------|------|
| **Market share of 4 largest carriers** | 61% | 68% | 61% | 65% | 84% |

**EXHIBIT A, PAGE 011**

*Total domestic revenue pulled from Form 41 data. Airlines included in sample set: American, Aloha, Alaska, Jetblue, Continental, Delta, Frontier, Airtran, Hawaiian, American West, Midway, Spirit, Northwest, Pan American, Sun Country, TWA, ATA, United, US Airways, Virgin America, Southwest and Midwest Express*

11

# Acquiring Virgin America Provides a Platform for Growth

## Powerful West Coast Network

  

## Enhanced Partnerships

 

## Access to Constrained Airports

 

## California Customer Base



## Increased Influence



## Opportunity to Grow & Improve Loyalty



**EXHIBIT A, PAGE 012**

Sources:  Bureau of Economic Analysis, DOT O&D Data and Published Schedules
Market  concentration defined as the ratio of the #1 carrier's market share to the #2 carrier's market share

# California is our single largest opportunity…



Population
11.9 Million

Daily
Passengers
North America
71,700

AK
0.7M

WA
7.2M

OR
4.0M



Population
39.1 Million

Daily
Passengers
North America
185,700

CA
39.1M

2.5x
PacNW Daily
Passengers

3x
PacNW
Population

**EXHIBIT A, PAGE 013**

# …with very attractive characteristics.



| Characteristic | Metric | US Rank |
|---|---|---|
| Population | 39.1M | #1 |
| Gross State Product | $2.3T | #1 |
| North America Pax/Day | 185,700 | #1 |
| Intl Passengers/Day | 11,750 | #3 |
| Gross State Product Growth | 4% | #4 |

**EXHIBIT A, PAGE 014**

Sources:  Bureau of Economic Analysis, DOT O&D Data and Published Schedules
Market  concentration defined as the ratio of the #1 carrier's market share to the #2 carrier's market share

# Alaska is heavily invested in California, but not to the extent required to establish a meaningful presence.

## Alaska North America Seat Share



| | 52% |
| | 43% |
| 52% | |
| | 7% |

## Alaska Daily Seats – Top States

| Rank | State | Daily Seats |
|------|-------|-------------|
| 1 | Washington | 39,654 |
| 2 | California | 22,747 |
| 3 | Oregon | 14,333 |
| 4 | Alaska | 12,770 |

**EXHIBIT A, PAGE 015**

Average daily scheduled seats for YE3Q16

# With Virgin America, we obtain valuable gates and landing slots on the East and West Coast.



**EXHIBIT A, PAGE 016**

# From day one, the combined carrier will have the largest seat share on the West Coast…



**Share of West Coast Seats**

**EXHIBIT A, PAGE 017**

*North America Seat Share from Alaska, Oregon, Washington, and California YE3Q16; total is less than 100% because smaller "other" category is excluded

17

# …and a significant presence at all major metropolitan areas.



**Anchorage**
46 Flights
9 Gates

**Seattle**
291 Flights
32 Gates

**Portland**
123 Flights
20 Gates

**San Francisco**
73 Flights
10 Gates

**Bay Area**
115 Flights

**LAX**
79 Flights
12 Gates

**LA Basin**
102 Flights

**EXHIBIT A, PAGE 018**

Average scheduled daily flights for Alaska and Virgin America YE3Q16

# Based on seat share, we will become the second largest carrier in SFO and relevant in a fragmented LAX…



**Passengers per Day Each Way**

**SFO**

**LAX**

## …with opportunity to further expand in other important California airports

**EXHIBIT A, PAGE 019**

Map represents Year-End Q1 '15 Domestic PDEW, Pie Charts represent YE Q3 '16 Domestic Seats

# Our market position in **San Francisco** moves from a distant #6 to a strong #2…

**SFO Customer Utility**

**Service in Top 10 Markets from SFO**

**6%**



Alaska - Today

| Rank | Market |
|------|--------|
| 1 | JFK |
| 2 | LAX |
| 3 | Las Vegas |
| 4 | Chicago |
| 5 | Boston |
| 6 | Seattle |
| 7 | Newark |
| 8 | San Diego |
| 9 | Denver |
| 10 | Dulles |

**EXHIBIT A, PAGE 020**

# Our market position in **San Francisco** moves from a distant #6 to a strong #2…



| | SFO Customer Utility |
|---|---|

**6%**
**58%**

Alaska - Today
Alaska - Post Merger

| | Service in Top 10 Markets from SFO |
|---|---|

| Rank | Market |
|---|---|
| 1 | JFK |
| 2 | LAX |
| 3 | Las Vegas |
| 4 | Chicago |
| 5 | Boston |
| 6 | Seattle |
| 7 | Newark |
| 8 | San Diego |
| 9 | Denver |
| 10 | Dulles |

**EXHIBIT A, PAGE 021**

# … And our utility in LAX increases substantially

## LAX Customer Utility

## Service in Top 10 Markets from LAX

**10%**

Current

| Rank | Market |
| --- | --- |
| 1 | JFK |
| 2 | San Francisco |
| 3 | Chicago |
| 4 | Seattle |
| 5 | Las Vegas |
| **6** | Denver |
| 7 | Newark |
| 8 | Honolulu |
| 9 | Boston |
| 10 | Atlanta |

**EXHIBIT A, PAGE 022**



Utility percentage represents share of domestic revenue for the year ended Q32015

# … And our utility in LAX increases substantially



## LAX Customer Utility

**52%**

**10%**

Current

Future

## Service in Top 10 Markets from LAX

| Rank | Market |
| --- | --- |
| 1 | JFK |
| 2 | San Francisco |
| 3 | Chicago |
| 4 | Seattle |
| 5 | Las Vegas |
| 6 | Denver |
| 7 | Newark |
| 8 | Honolulu |
| 9 | Boston |
| 10 | Atlanta |

**EXHIBIT A, PAGE 023**

Utility percentage represents share of domestic revenue for the year ended Q32015

# Combining our loyalty programs and networks will provide greater benefits for West Coast customers and…





**EXHIBIT A, PAGE 024**

…a partner portfolio that gives our customers expansive global reach. But more importantly…



**EXHIBIT A, PAGE 025**

…we've created a strong West Coast airline for our customers.



EXHIBIT A, PAGE 026

# We believe there is significant demand for low-fare carriers that offer a premium product.



**North America Revenue**

**Network Carriers**

**Low Fare Premium Product Carriers**

**Low Cost Carriers**

**Ultra Low Cost Carriers**

66%

12%

19%

3%

**EXHIBIT A, PAGE 027**

# We were pioneers in managing to ROIC and consistently create significant value for our owners.

**After-Tax Return on Invested Capital**





**EXHIBIT A, PAGE 028**

# We are generating strong margins, consistent with high-quality industrial companies.

**Industry and Sector Leading Pre-Tax Margin (2015)**



- S&P 500: 13.0%
- Industrials: 13.1%
- Legacies: 13.9%
- LCC's: 18.8%
- Alaska: 24.0%



Alaska's pre-tax margin is higher than all but 10 companies included in the S&P 500

Network: AAL, DAL, UAL. LCC's : LUV, HA, JBLU, SAVE, and ALGT
Industrials refers to all industrial companies included in the S&P 500

**EXHIBIT A, PAGE 029**

29

# We have a track record of balanced cash flow allocation.



**Cash Flow from Operations** — $6,060M

**Pension Contributions** — $493M

**Capex (Aircraft/Other)** — $3,007 M

**Cash Returned to Shareholders** — $1,395M

**Debt Payments Net of Borrowing** — $1,221M

2010 to 2015 cash generation and deployment. Capex includes both aircraft and other capex

**EXHIBIT A, PAGE 030**

# We have reduced our leverage and now have an investment-grade balance sheet



**Debt-to-Cap**

- 2008: 81%
- 2010: 67%
- 2015: 27%

| AIRLINE CREDIT RATING | | |
| --- | --- | --- |
| | **S&P** | **Fitch** |
| BBB+ | | SOUTHWEST + |
| BBB | SOUTHWEST | |
| BBB- | Alaska | Alaska |
| BB+ | ▲ | ▲ + |
| BB | allegiant | + |
| BB- | jetBlue + | jetBlue |
| B+ | | + |
| B | | |
| B- | | |

**Investment Grade**

**EXHIBIT A, PAGE 031**

31

# We are extending Alaska's track record of successful growth to a larger platform

**Mainline ASM Growth by Year, 1995–2015**



Overall Growth Rate: 7.7%
Industry Growth Rate: 1.0%

- Combination of the two powerful networks in the West creates meaningful synergies.

- Virgin and Alaska are both low-cost high-value carriers.

- We now have a strong growth platform.

*U.S. Domestic Industry Data from A4A

**EXHIBIT A, PAGE 032**

# This acquisition produces higher pre-tax profits at similar margins.



## Pre-Tax $



## Pre-Tax Margin %

**EXHIBIT A, PAGE 033**

ALK+VA based on 2015 adjusted earnings.   Synergies shown are run-rate synergies

33

# Significant synergies create value for our owners.

|  | Average Annual Run Rate Estimates |
|---|---|
| Revenue Synergies | $175M |
| Net Cost Synergies | $50M |
| **Total Synergies** | **$225M** |

**We expect one-time costs to total ~$300M - $350M**

EXHIBIT A, PAGE 034

# These synergies are in line with recent deals in the sector.



**Net Synergies**

$680M
6.5%

$2.0B
6.3%

$1.0B - $1.2B

3.9%

$225M
3.1%

> $400M
2.8%

> $1.0B
2.7%

**Average: 4.4%
of Annual Returns**

*Source:  SEC filings by other airlines*
*Notes:  Delta / Northwest announced merger with $1.1b in synergies and revised upward to $2.0b after closing.*
*Average reflects actuals only*

**EXHIBIT A, PAGE 035**

35

# We expect synergies to ramp up quickly.



EXHIBIT A, PAGE 036

# We expect to finance the transaction with cash on hand, aircraft debt and a temporary slowdown of share buybacks.

| Acquisition Price | |
|---|---|
| Equity Purchased | $2.6B |
| Net Debt and Leases Assumed | $1.4B |
| **Total** | **$4.0B** |

| Financing Sources | |
|---|---|
| Cash | $0.6M |
| Debt and Leases Assumed | $1.4B |
| New Debt Issued | $2B |
| **Total** | **$4.0B** |

**EXHIBIT A, PAGE 037**

# Post merger, our leverage remains one of the lowest in the industry…



**Debt-to-Cap**

| LUV | JBLU | DAL | ALK | SAVE | ALGT | UAL | HA | AAL |
|-----|------|-----|-----|------|------|-----|-----|-----|
| 40% | 46% | 48% | 58% | 63% | 65% | 66% | 78% | 84% |

**EXHIBIT A, PAGE 038**

*Source: OALs come from 2015 10-K reports.  ALK is a pro forma modeled on the combined carrier.*

# …and in line with S&P 500 industrials.



**We are committed to "re-de-leveraging" the balance sheet**

**EXHIBIT A, PAGE 039**

# Virgin's fleet plan provides us flexibility.



**EXHIBIT A, PAGE 040**

# We remain committed to returning capital to our owners via a growing dividend and consistent share buybacks.



**ANNUAL RETURN OF CAPITAL ($ IN MILLIONS)**

■ Dividend
■ Share Repurchase

Slow down repurchases during integration

| | 2013 | 2014 | 2015 | 2016E |
|---|---|---|---|---|
| Dividend | $28 | $68 | $102 | ~$130 |
| Share Repurchase | $159 | $348 | $505 | ~$200+ |

2017E  2018E

**EXHIBIT A, PAGE 041**

\* Dividend spend subject to Board approval.
+ Share repurchase based on current expected case – subject to change.

# Recap

1. We have a track record of being **best-in-class operators**

2. We have **generated return far in excess** of our industry peers and our cost of capital

3. Larger platform for growth and deal synergies will allow us to **create greater value for all of our stakeholders**

4. We remain **focused on the quality** of our balance sheet and returns to shareholders



EXHIBIT A, PAGE 042

# It's time to take our talents to a larger stage.

   

**Highest-rated for customer service, 8 years in a row.**
—J.D. Power

**Number 1 airline in the US, 3 years in a row.**
—Wall Street Journal

    

**The most on-time airline in North America. 6 years and counting.**
—FlightStats.com

**EXHIBIT A, PAGE 043**

# Alaska and Virgin both run strong operations.

## THE WALL STREET JOURNAL.

### 2015 Airline Scorecard | Rankings of major carriers in key operational areas, best to worst

| | Overall rank | On-time arrivals | Canceled flights | Extreme delays | 2-hour tarmac delays | Mishandled baggage | Involuntary bumping | Fewest Complaints |
|---|---|---|---|---|---|---|---|---|
| 1 | Alaska | Alaska | Frontier | Alaska | Alaska | Virgin Amer. | JetBlue | Alaska |
| 2 | Virgin Amer. | Delta | Virgin Amer. | Delta | Southwest | JetBlue | Virgin Amer. | Southwest |
| 3 | Delta | Southwest | Alaska | Southwest | Virgin Amer. | Delta | Delta | Delta |
| 4 | Southwest | Virgin Amer. | Southwest | Virgin Amer. | Delta | Spirit | Spirit | JetBlue |
| 5 | JetBlue | JetBlue | Delta | American | Frontier | Frontier | Alaska | Virgin Amer. |
| 6 | Frontier | United | JetBlue | United | JetBlue | United | American | United |
| 7 | United | American | Spirit | JetBlue | Spirit | Southwest | United | American |
| 8 | Spirit | Frontier | United | Frontier | United | Alaska | Southwest | Frontier |
| 9 | American | Spirit | American | Spirit | American | American | Frontier | Spirit |

**EXHIBIT A, PAGE 044**

Sources: On-time and canceled flights data for full year 2014 from masFlight. Includes regional affiliate flights. extreme delays, which are 45 minutes or longer, compiled by FlightStats Inc. Two-hour tarmac delays, mishandled baggage, and consumer complaints from Department of Transportation based on 12 months ended in November. DOT involuntary-bumping data 12 months through September.

44

# Both of us operate young fleets…

**Fleet Age in Years**



Spirit 5, Virgin 6, JetBlue 8, Alaska 10, Hawaiian 10, American 11, Southwest 12, United 14, Delta 17, Allegiant 22



Combined fleet age of 8.5 years

**EXHIBIT A, PAGE 045**

*Source: Airfleets.net.  Mainline only.*

45

# …that are highly fuel efficient.

### Fuel EfficiencyASM's/Gallon





Our combined fuel efficiency would be over 20% better than legacy carriers

**EXHIBIT A, PAGE 046**

*Source: 2015 10-K reports. Mainline only.*

46



# Our customers will benefit.

- Award winning service

- Fares lower than legacy airlines

- Expanded service for Virgin customers to thriving Silicon Valley and Seattle markets

- More flight frequency to international airlines departing SFO, SEA and LAX

- New access to capacity-constrained markets

EXHIBIT A, PAGE 047

# We are committed to taking care of employees













**EXHIBIT A, PAGE 048**

48

# Deal Milestones



**EXHIBIT A, PAGE 049**

# The Premier Airline for People on the West Coast



EXHIBIT A, PAGE 050